**SOUTHERN CALIFORNIA COUNSELING CENTER, Plaintiff,**

v.

**GREAT AMERICAN INSURANCE COMPANY, Defendant.**

**CV 13–5468 ABC (AGRx)**

United States District Court, C.D. California, Western Division.

Signed June 17, 2014

---

106. *See id.*

107. *See In re Republic of Ecuador,* 2010 WL 3702427, at *5.

108. *See* Docket No. 25 at 17-18.

109. *See id.* at 18.

110. *See id.* at 19.

Avi N. Wagner, The Wagner Firm, Los Angeles, CA, for Plaintiff.

Carleton Ray Burch, Kenneth D. Watnick, Anderson McPharlin and Conners LLP, Los Angeles, CA, for Defendant.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

### AUDREY B. COLLINS, UNITED STATES DISTRICT JUDGE

Pending before the Court are cross motions for summary judgment filed by Plaintiff Southern California Counseling Center ("SCCC," docket no. 22) and Defendant Great American Insurance Company ("GAIC," docket no. 20). The parties filed Oppositions and Replies. The Court will resolve the Motions without oral argument and therefore **VACATES** the hearing set for June 16, 2014. For the following reasons, the Court **GRANTS** GAIC's Motion and **DENIES** SCCC's Motion.

## I. BACKGROUND

SCCC is suing GAIC for declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing to recover benefits due under a

GAIC-issued insurance policy's coverage for computer fraud. SCCC contends that it suffered approximately $100,000 in loss caused by computer fraud when a sham payroll company withdrew funds from SCCC's bank accounts and converted those funds to its own use instead of using them to pay SCCC's federal and state payroll taxes as promised. GAIC contends that the policy does not cover this loss on several grounds, not all of which the Court will reach. Both parties move for summary judgment.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing on the essential elements of its claims on which it bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of fact is genuine if it reasonably can be resolved in favor of either party. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.* at 255, 106 S.Ct. 2505. But "mere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir. 1989).

## III. UNDISPUTED MATERIAL FACTS

In this insurance coverage dispute, the material facts consists of the terms of the insurance policy and the circumstances giving rise to SCCC's claimed loss. Although the parties phrase their respective statements of fact slightly differently, none of the material facts, which are set forth below, is genuinely disputed.

### A. Circumstances of SCCC's Loss

Southern California Counseling Center ("SCCC") is a non-profit organization in Los Angeles. Defendant's Statement of Undisputed Facts ("DSUF") 1.

In response to an unsolicited offer received in the mail from Ben Franklin Payroll Services ("Ben Franklin") that it would provide free payroll services to SCCC, SCCC executed various agreements on December 15, 2011 relating to payroll services, including a Payroll Tax Service Agreement, an Authorization Agreement for Automatic (ACH) Debits, a Limited Power of Attorney, and a Reporting Agent Authorization with the Internal Revenue Service. DSUF 2–4.

Pursuant to the Payroll Tax Service Agreement, SCCC authorized Ben Franklin to "initiate ACH transactions against Client's bank account (as listed in the Authorization Agreement for Automatic (ACH) Debits) two (2) days prior to each payroll check date for all applicable payroll taxes incurred related to that payroll." DSUF 5.

In the Payroll Tax Service Agreement, Ben Franklin agreed to "prepare and file all quarterly and annual [payroll tax] reports." DSUF 6.

Pursuant to the Authorization Agreement for Automatic (ACH) Debits, SCCC authorized Ben Franklin to "initiate debits to cover obligations incurred for Client's

payroll tax filings and for invoice obligations due [Ben Franklin]." DSUF 7.

Pursuant to the Limited Power of Attorney and Authorization, SCCC appointed Ben Franklin as its "attorney-in fact to sign and file employment tax returns and make deposits for the Taxpayer [SCCC] to federal, state and local jurisdictions" commencing with the first quarter of 2012. SCCC also confirmed that Ben Franklin was "authorized to receive copies of notices, correspondence and transcripts with respect to employment tax returns filed by or on behalf of the Taxpayer [SCCC]." DSUF 9.

In the Reporting Agent Authorization, IRS Form 8655, SCCC authorized Ben Franklin to sign and file quarterly payroll tax returns beginning with the first quarter of 2012. DSUF 10.

In the Reporting Agent Authorization, IRS Form 8655, SCCC agreed that Ben Franklin was "authorized to receive otherwise confidential taxpayer information from the IRS to assist in responding to certain IRS notices...." DSUF 11.

In January 2012, based on the various agreements between SCCC and Ben Franklin, Ben Franklin began providing SCCC with payroll services. DSUF 12.

After receiving payroll-related information that SCCC entered into a database through Ben Franklin's website, Ben Franklin would initiate ACH transfers from SCCC's account to Ben Franklin's account for payroll and payroll taxes. DSUF 13–16.

Ben Franklin would prepare and provide SCCC with payroll checks for some employees and arrange for direct deposit for other employees. Ben Franklin would retain the ACH transfers for payroll taxes in the Ben Franklin account. DSUF 17–18.

After learning that Ben Franklin's CEO Richard Zakaraian was arrested, SCCC contacted the taxing authorities and learned that Ben Franklin had not paid SCCC's state and federal payroll taxes that were due on March 31, 2012 and June 30, 2012. SCCC has since paid $97,467.50 in principal for these unpaid payroll taxes. DSUF 19–22.

## B. Applicable Terms of the Insurance Policy

Great American Insurance Company ("Great American") issued an insurance policy to SCCC. DSUF 23.

The Computer Fraud Insuring Agreement of the GAIC Policy ("Policy") provides coverage for "loss of or damage to 'money,' 'securities' and 'other property' resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the 'premises' or 'banking premises': a. to a person (other than a 'messenger') outside those 'premises'; or b. to a place outside those 'premises.'" DSUF 24.

The Policy does not cover: c. Acts of Employees, Managers, Directors, Trustees or Representatives Loss resulting from "theft," or any other dishonest act committed by any of your "employees," "managers," directors, trustees or authorized representatives: (1) whether acting alone or in collusion with other persons; or (2) while performing services for you or otherwise; except when covered under Insuring Agreement A.1. DSUF 26.

The Policy defines the term "theft" to mean the "unlawful taking of property to the deprivation of the Insured." DSUF 27.

The Policy defines the term "employee" to mean different types of natural persons. DSUF 28.

The Policy states that the term "employee" "does not mean any agent, broker, factor, commission, merchant, consignee, independent contractor or representative

of the same general character...."
DSUF 29.

SCCC has admitted that its claim is not covered under Insuring Agreement A.1 of the Policy. DSUF 31.

## IV. DISCUSSION

The Motions turn on questions of contract interpretation: was SCCC's loss caused by computer fraud within the meaning of the Policy, and does any exclusion apply?

### A. Principles of Interpreting an Insurance Contract

 Interpretation of an insurance policy is a question of law for the court. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). Insurance contracts are governed by the ordinary rules of contract interpretation. *Universal City Studios Credit Union v. Cumis Ins. Society, Inc.*, 208 Cal.App.4th 730, 737, 145 Cal.Rptr.3d 650 (2012).

 The court is to interpret an insurance policy so as to give effect to the parties' mutual intentions as of the time of contracting. *Palmer v. Truck Ins. Exchange*, 21 Cal.4th 1109, 1115, 90 Cal. Rptr.2d 647, 988 P.2d 568 (1999); Civ. Code, §§ 1636 and 1639. Where contract language is clear and explicit, it governs. *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). A court must interpret a contract to give effect to all of its terms and avoid an interpretation that renders a term mere surplusage. *Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App.4th 1054, 1063–64, 119 Cal.Rptr.3d 17 (2010). A court may not rewrite the terms of the policy or engage in a forced construction. *Rosen v. State Farm*, 30 Cal.4th 1070, 1078–1080, 135 Cal.Rptr.2d 361, 70 P.3d 351 (2003). When "the terms of the policy are plain and explicit the courts will not indulge in a forced construction so as to fasten a liability on the insurance company which it has not assumed." *First Am. Title Ins. Co. v. XWarehouse Lending Corp.*, 177 Cal. App.4th 106, 115, 98 Cal.Rptr.3d 801 (2009) (citation omitted).

 The insured has the burden of proving coverage under the Policy. *Waller*, 11 Cal.4th at 18, 44 Cal.Rptr.2d at 376, 900 P.2d 619; *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 483–485 (9th Cir. 1991). The insurer bears the burden of proving that a policy exclusion applies. *Aydin Corp. v. First State Ins. Co.*, 18 Cal.4th 1183, 1188, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (1998).

### B. The Authorized Representative Exclusion Applies.

 Assuming, arguendo, that SCCC's loss was caused by computer fraud as defined by the Policy's Computer Fraud Insuring Agreement, GAIC properly denied SCCC's claim if it falls within a coverage exclusion. GAIC argues that SCCC's loss falls within the "authorized representative" exclusion because Ben Franklin was its authorized representative when it engaged in the fraud that caused SCCC's loss.

The authorized representative exclusion states that the Policy does not cover "loss resulting from 'theft' or any other dishonest act committed by any of your ... Authorized representatives ... except when covered under Insuring Agreement A.1." SCCC admitted in discovery that its claim is not covered by Insuring Agreement A.1. Thus, if SCCC's loss was caused by theft or any other dishonest act committed by an authorized representative, the above exclusion applies and SCCC's loss is not covered.

Here, there is no question that Ben Franklin's conduct amounts to "theft" or a dishonest act: instead of using funds it

withdrew from SCCC's bank account to pay SCCC's payroll taxes as it had promised, Ben Franklin converted them for its own use. SCCC also characterizes Ben Franklin's overall conduct as fraudulent.

The Court also finds that Ben Franklin was SCCC's "authorized representative." In *Stanford Univ. Hosp. v. Fed. Ins. Co.*, 174 F.3d 1077, 1085 (9th Cir.1999), the Ninth Circuit construed the term "authorized representative" in connection with a crime insurance policy similar to the policy here. After noting that "the 'authorized representative' language must be construed narrowly since it is an exclusion clause," the Court found that the term "is not ambiguous and covers those who by authorization of the insured are given access to and permitted to handle the insured's funds." *Stanford Univ. Hosp.*, 174 F.3d at 1085. The Court noted that "[n]o other interpretation would make sense in terms of the crime insurance policy. The 'authorized representative' provision excludes coverage for misappropriation of funds by those individual or entities authorized by the insured to have access to the funds-in essence, those whom the insured empowers to act on its behalf." *Id.*

The Court discerns no reason why this definition should not apply in this case. SCCC argues that *Stanford Univ. Hosp.* is factually distinguishable because the wrongdoer there performed its duties faithfully for a long time before it misappropriated the insured's funds, whereas here, SCCC contracted with Ben Franklin for less than a year and Ben Franklin never performed its obligation to pay SCCC's taxes. However, *Stanford Univ. Hosp.* is instructive not because of its facts but because of the Court's resolution of a purely legal question: the meaning of the term "authorized representative" in a crime insurance policy. Notably, the Court's resolution of that legal question— defining "authorized representative—did

not turn on facts regarding the duration of the relationship or the wrongdoer's prior trustworthy conduct. It turned on the policy's language. In any event, *Stanford Univ. Hosp.*, like this case, involved a representative's use of the insured's funds. Thus, insofar as *Stanford Univ. Hosp.'s* discussion of the meaning of "authorized representative" references access to funds, this case is on all fours. Nothing in the case suggests that the definition the Court announced was limited or not broadly applicable.

Based on the foregoing definition, it is clear that Ben Franklin was SCCC's "authorized representative" when it withdrew funds from SCCC's bank account and converted them—the conduct that caused SCCC's loss. SCCC executed various agreements to enable Ben Franklin to perform the payroll services for which they were contracting, including a Payroll Tax Service Agreement, an Authorization Agreement for Automatic (ACH) Debits, a Limited Power of Attorney, and a Reporting Agent Authorization with the Internal Revenue Service. Pursuant to these agreements, SCCC authorized Ben Franklin to make ACH debits from SCCC's bank account. SCCC also authorized Ben Franklin to be its representative for purposes of making payroll tax payments to the taxing authorities. Evidently, Ben Franklin did not use the funds it withdrew to pay SCCC's payroll taxes as it promised. However, this does not negate the fact that SCCC authorized Ben Franklin to withdraw and handle the funds in the first place. Thus, Ben Franklin was, by "authorization of [SCCC,] given access to and permitted to handle the [SCCC]'s funds ...—in essence, [Ben Franklin is someone] whom the insured [SCCC] empower[ed] to act on its behalf." *Stanford Univ. Hosp.*, 174 F.3d at 1085. Ben Franklin was therefore SCCC's authorized

representative when it engaged in the conduct that caused SCCC's loss.

 SCCC argues at length that the authorization it granted Ben Franklin was void *ab initio* because Ben Franklin induced this authority by fraud. In particular, SCCC contends that because Ben Franklin never made any of SCCC's payroll tax payments, Ben Franklin intended from the outset to convert the withdrawn funds rather than to use them for the purpose for which SCCC authorized their withdrawal. SCCC thus contends that Ben Franklin was not in fact its authorized representative.

 This argument is unpersuasive. "Fraud in the execution results in an agreement being void *ab initio*, whereas fraud in the inducement makes the transaction merely voidable." *Sw. Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir.1986). Fraud in the inducement arises when a party is "induce[d] ... to assent to something he otherwise would not have; [fraud in the execution] induces a party to believe the nature of his act is something entirely different than it actually is. [citation] 'Fraud in the execution' arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.'" *Id.*

Plaintiff first characterizes its circumstance as fraud in the inducement, and then contends in its reply that it was actually fraud in the execution. *Compare* Mot. 16:25–26 (stating that Ben Franklin fraudulently induced SCCC to enter into relationship) *with* Reply 7:248:15 (arguing that there was also fraud in the execution of its agreements with Ben Franklin). It is clear that SCCC was fraudulently induced to enter into the agreements with Ben Franklin. SCCC entered into the agreements making Ben Franklin its authorized representative because it believed

that Ben Franklin would perform as promised and make SCCC's payroll tax payments. Had SCCC known that Ben Franklin never intended to perform as promised, it would not have entered into these agreements. Thus, absent Ben Franklin's fraud (representing that it would make the payments), SCCC would not have assented to the relationship. Also, by its own admission, SCCC knew the nature of the documents it was signing and had the opportunity to perform due diligence. This circumstance is textbook fraud in the inducement. This is not fraud in the execution: SCCC does not claim that the documents it signed were not what it thought it was signing, or that its execution of those documents had a different legal significance than what it thought. Because there was no fraud in the execution of the agreements by which SCCC authorized Ben Franklin to be its representative, the agreements and Ben Franklin's resulting status were merely voidable and not void *ab initio*. Thus, SCCC's argument that Ben Franklin was never its authorized representative fails.

To decide this issue in SCCC's favor would be to rewrite the Policy, such that the exclusion would apply not to "any" authorized representative as the Policy states, but only to authorized representatives who did not fraudulently induce their status. The Court may not do this. *See Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal.App.4th 1466, 1482, 105 Cal. Rptr.3d 200 (2010) ("[I]t is difficult to fathom what public policy would be advanced by requiring the court to rewrite an unambiguous policy provision and essentially insert an additional phrase permitting the additional insured to satisfy the SIR obligation."); *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal.4th 758, 763, 110 Cal.Rptr.2d 844, 28 P.3d 889 (2001) (referring to the "fundamental principle that in interpreting contracts, including insurance contracts,

courts are not to insert what has been omitted").

In addition, the construction SCCC urges would render the authorized representative exclusion a nullity. No insured would or could validly authorize a representative to defraud it, steal from it, or perform dishonest acts to its detriment. All such conduct would necessarily exceed any conceivable valid authorization. Thus, were this exclusion to turn on a valid authorization, the exclusion would never apply because a representative who stole from the insured would necessarily be outside the definition of "authorized representative" with respect to the theft.

■■■ Finally, SCCC argues that its relationship was with Ben Franklin and not with its CEO Richard Zakaraian who was also involved in the fraud. However, a fictitious entity can only act through its officers and employees, so that Ben Franklin's CEO was largely responsible for the fraud that caused SCCC's loss does not exempt it from the authorized representative exclusion.

For the foregoing reasons, the Court finds that the authorized representative exclusion applies and therefore, SCCC's loss is not covered by the Policy. This determination is dispositive of SCCC's claims for declaratory relief and breach of contract. Because SCCC's claim for breach of contract fails, its claim for breach of the covenant of good faith and fair dealing necessarily fails. Because the foregoing resolves all of SCCC's claims, the Court need not reach the parties' remaining arguments.

## V. CONCLUSION

For the foregoing reasons, Defendant Great American Insurance Company's Motion for Summary Judgment is **GRANTED** and Plaintiff Southern California Counseling Center's Motion for Partial Summary Judgment is **DENIED**.

GAIC must file a proposed Judgment within ten (10) days of the issuance of this Order.

**IT IS SO ORDERED.**