Filed 12/11/23  Helguera v. Mid-Century Insurance Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SALVADOR HELGUERA et al., | D082231 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVSB2113044) |
| MID-CENTURY INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Donald R. Alvarez, Judge.  Affirmed.

Shernoff Bidart Echeverria, Michael J. Bidart, Ricardo Echeverria, Danica Crittenden; Law Offices of Joseph H. Low IV, Joseph H. Low IV; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Appellants.

Woolls Peer Dollinger & Scher, Gregory B. Scher, and H. Douglas Galt for Defendants and Respondents.

# I

## INTRODUCTION

Mid-Century Insurance Co. (Mid-Century) issued a homeowners insurance policy that required it to defend and indemnify its insureds for third-party bodily injury claims resulting from accidents occurring within the policy period. The guarantee of coverage is subject to exclusions, one of which states, "We do not cover bodily injury ... which is caused by, arises out of or is the result of an intentional act by or at the direction of any insured. ... [¶] ... [¶] For purposes of application of this exclusion, a plea of guilty ... in a criminal proceeding, which involves the same acts or activities which are the basis of a claim for damages against any insured, shall conclusively bar ... coverage under this policy." (Bolding omitted.)

During a party at the insureds' home, the primary policyholder's 23-year-old son—an insured under the policy—picked up a loaded firearm he believed was unloaded, pointed it at an 18-year-old guest, and fatally shot him. The shooter pleaded guilty to involuntary manslaughter and was named as a defendant in a wrongful death lawsuit filed by the decedent's parents, Salvador Helguera and Natalia Amador. He tendered defense of the wrongful death lawsuit to Mid-Century, which refused coverage due to the exclusion quoted above.

The decedent's parents, acting as assignees of the shooter's interests under the policy, then filed the present litigation against Mid-Century and its affiliates, Farmers Insurance Exchange (Farmers Exchange) and Farmer's Group Inc. (Farmers Group), arguing they violated their contractual duty to defend and indemnify the shooter in the wrongful death lawsuit. The trial court found the defendants properly denied coverage, sustained demurrers to the complaint, and entered a judgment of dismissal. We affirm.

2

II

BACKGROUND

The following background is taken from the allegations of the complaint and the exhibits attached thereto, which we assume are true under the standard of review applicable to our review of a ruling on a demurrer. (*LeBrun v. CBS Television Studios, Inc.* (2021) 68 Cal.App.5th 199, 202.)

A. *The Policy*

Roberto Sarellano (Roberto) bought a homeowners insurance policy from Mid-Century, effective for one year beginning December 13, 2014.[1] Subject to exclusions, the policy requires Mid-Century to defend and indemnify its insureds against any bodily injury claim resulting from an "occurrence," up to a limit of $500,000 per "occurrence." The policy defines "insured" to include Roberto and relatives who permanently reside in his household. It defines "occurrence" as "an accident ... which occurs during the policy period, and which results in bodily injury ... during the policy period." (Bolding omitted.)

Mid-Century's duty to indemnify and defend its insureds is subject to numerous exclusions, which preclude coverage that would otherwise be available under the policy's insuring clause. One exclusion (hereafter, the intentional acts exclusion) appears under the bolded heading, "**Intentional Acts**." In relevant part, it reads:

> We do not cover bodily injury ... which is caused by, arises out of or is the result of an intentional act by or at the direction of any insured. By way of example this includes but is not limited to any intentional act or intentional failure to act by any insured, whether a criminal act or otherwise, where resulting injury or damage would be objectively expected to a

---

[1] Two persons involved in this case share the surname Sarellano. We refer to them by first name to avoid confusion. No disrespect is intended.

3

high degree of likelihood, even if not subjectively intended or expected. This exclusion applies even if ...

[¶] ...

Any insured did not understand that injury or damage may result ...

[¶] ...

For purposes of application of this exclusion, a plea of guilty, no contest, or true in a criminal proceeding, which involves the same acts or activities which are the basis of a claim for damages against any insured, shall conclusively bar any bodily injury ... arising or resulting from or caused by such acts or activities from coverage under this policy. This applies whether the insured actually admits or admitted guilt by plea.

(Bolding omitted.)

B. *The Shooting*

On March 28, 2015, Roberto's 23-year-old son, Alonzo Sarellano (Alonzo), hosted a party at his parents' home. Alonzo lived in his parents' home and was an insured under Roberto's homeowners insurance policy. The plaintiffs' son, 18-year-old Salvador Helguera-Amador, attended Alonzo's party.

After consuming alcohol, Alonzo retrieved a firearm from one of the rooms, pulled the firearm slide to the rear, aimed the firearm at a guest, and pulled the trigger. The firearm was unloaded and did not fire. However, Alonzo set the firearm down and, unbeknownst to him, another guest loaded a round into the firearm's magazine. Later during the party, Alonzo picked up the firearm again, aimed it at Helguera-Amador, and pulled the trigger without confirming whether the firearm was still unloaded. Helguera-Amador was struck by a bullet and suffered a fatal gunshot wound.

On January 14, 2016, Alonzo pleaded guilty to involuntary manslaughter for killing Helguera-Amador (Pen. Code, § 192, subd. (b)), and

4

he admitted he personally used a firearm in the commission of the offense (*id.*, § 12022.5, subd. (a)).[2]

C. *The Underlying Lawsuit*

On June 22, 2016, plaintiffs Helguera and Amador filed a wrongful death action against Roberto and Alonzo for the death of their son, alleging claims for general negligence, negligence per se, and premises liability. Mid-Century agreed to defend Roberto in the lawsuit, but refused to defend or indemnify Alonzo. In denying coverage for Alonzo, Mid-Century asserted Alonzo's shooting of the firearm was not a covered "occurrence" because it was "intentional," not an "accident." Mid-Century also invoked the intentional acts exclusion to refuse coverage.

Robert was dismissed from the wrongful death litigation on summary judgment. However, Alonzo did not respond to the wrongful death complaint or make an appearance. The plaintiffs requested entry of default, which the court clerk granted. The plaintiffs then sent Mid-Century an offer to settle their claims against Alonzo for the policy limit of $500,000, but Mid-Century rejected the offer. Thereafter, the court entered a default judgment against Alonzo in an amount exceeding $20 million.

The plaintiffs and Alonzo executed an assignment of rights and covenant not to execute. Under this agreement, Alonzo assigned the plaintiffs his rights against Mid-Century and, in exchange, the plaintiffs agreed not to levy execution on the default judgment.

---

[2]     The manslaughter statute defines involuntary manslaughter as "the unlawful killing of a human being without malice," either "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).)

D. *The Present Lawsuit*

On April 16, 2021, the plaintiffs, acting as assignees of Alonzo's interests, filed the current lawsuit against Mid-Century, Farmers Exchange, and Farmers Group for breach of contract and bad faith.[3]  They alleged the defendants breached the homeowners insurance policy and acted in bad faith by failing to defend and indemnify Alonzo in the wrongful death action.  They attached several exhibits to their complaint, including the homeowners insurance policy.

The defendants demurred and asserted coverage was barred by the intentional acts exclusion—specifically the portion of the exclusion barring coverage when an insured pleads guilty in a criminal proceeding involving the same acts or activities forming the basis of a third party's claim for damages.  The trial court sustained the demurrers based on the intentional acts exclusion and granted leave to amend.[4]  The plaintiffs elected not to file an amended complaint and the court entered judgment for the defense.

The plaintiffs appeal.

III

DISCUSSION

A. *Standard of Review*

" 'In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules.' [Citation.]  We review the

---

[3]    Farmers Exchange is an insurance exchange that acts as Mid-Century's operating manager, while Farmers Group is the attorney-in-fact for Mid-Century's subscribers.

[4]    Farmers Group did not file a demurrer or a joinder to the other defendants' demurrers, but the parties stipulated the arguments in the other demurrers applied to Farmers Group.  Because the parties proceed as if Farmers Group had filed its own demurrer, we will do the same.

6

operative complaint 'de novo to determine whether the complaint alleges facts sufficient to state a cause of action under any legal theory or to determine whether the trial court erroneously sustained the demurrer as a matter of law.' [Citation.] We construe the complaint in a reasonable manner and assume the truth of properly pleaded factual allegations that are not inconsistent with other allegations, exhibits, or judicially noticed facts. [Citation.] We need not accept as true, however, contentions, deductions, or conclusions of fact or law. [Citation.] Appellant bears the burden of demonstrating that the trial court erred." (*State ex rel. Edelweiss Fund, LLC v. JPMorgan Chase & Co.* (2023) 90 Cal.App.5th 1119, 1134, fn. omitted.)

B. *The Plaintiffs Failed to State A Breach of Contract Cause of Action*

The plaintiffs challenge the trial court's determination that they failed to allege facts establishing that the defendants breached their obligations under the homeowners insurance policy by failing to defend or indemnify Alonzo in the wrongful death action. Their argument for coverage is a fairly unusual one, so we believe it is helpful to clarify at the outset certain issues that are often in dispute in insurance litigation, but are uncontested here.

The defendants do not dispute that Alonzo is an "insured" under the policy and his shooting of Helguera-Amador was an "occurrence"—i.e., an "accident" occurring within the policy period. Thus, the defendants effectively concede that there is at least a potential for coverage in the absence of an applicable exclusion like the intentional acts exclusion.

For their part, the plaintiffs do not dispute that Alonzo pleaded guilty in a criminal proceeding involving the same acts or activities forming the basis for their claim for bodily injury damages. In other words, they do not contest that the intentional acts exclusion was satisfied according to its express terms. Moreover, the plaintiffs concede the intentional acts

7

exclusion, taken as a whole, is conspicuous, plain, and clear. (See *24th & Hoffman Investors, LLC v. Northfield Insurance Co.* (2022) 82 Cal.App.5th 825, 834 [" '[T]o be enforceable, any provision that takes away or limits coverage reasonably expected by an insured must be "conspicuous, plain and clear." ' "].) Thus, the plaintiffs accept that the intentional acts exclusion applies—and precludes coverage—*so long as the exclusion is valid*.

This brings us to the plaintiffs' argument on appeal. The plaintiffs contend the intentional acts exclusion is facially invalid because it is so overbroad that it makes the policy's promise of coverage for negligence claims illusory. This argument requires some explanation. As a general matter, an insurance policy that promises coverage for "accidents," like the policy at issue here, guarantees coverage for claims predicated on an insured's negligence. (*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.* (2018) 5 Cal.5th 216, 221 [" '[T]he term "accident" is more comprehensive than the term "negligence" and thus includes negligence' "], quoting *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 765 (*Safeco*).)

But, according to the plaintiffs, the promise of coverage for negligence claims in Mid-Century's policy is illusory because the intentional acts exclusion is so far-reaching it precludes coverage in *all* negligence cases. As noted, the exclusion applies when a bodily injury claim "is caused by, arises out of or is the result of an intentional act ... of any insured," irrespective of whether the insured intended harm or knew, or should have known, that bodily injury could occur. (Bolding omitted.) In the plaintiffs' view, Mid-Century can invoke the exclusion to preclude coverage for *any* negligence claim, since " 'negligence' in California is a breach of the duty imposed by Civil Code section 1714, subdivision (a), which requires everyone to exercise 'ordinary care or skill in the management of his or her property or person,' "

8

and "[i]t is impossible to 'manage' one's person or property without acting intentionally at some point." Stated differently, the plaintiffs contend *every* negligence claim against an insured is caused by, arises out of, or is the result of an insured's intentional act—and thus Mid-Century could call upon the exclusion to preclude coverage whenever its insureds are sued for negligence.

In making this argument, the plaintiffs liken the promise of coverage in Mid-Century's policy to the promise of coverage that was at issue in *Safeco*, a case involving similar facts. In *Safeco*, a teenager procured a firearm from his mother's coat pocket, which he believed to be unloaded—then pulled the trigger and fatally shot a friend. (*Safeco, supra*, 26 Cal.4th at p. 761.) The juvenile court sustained a wardship petition alleging the shooter perpetrated involuntary manslaughter. (*Ibid*.) Thereafter, the decedent's parents filed a wrongful death action against the shooter and his parents, who tendered defense of the case to Safeco, the insurer under their homeowners insurance policy. (*Ibid*.) The policy promised coverage for bodily injury caused by an "occurrence," which it defined as an "accident" resulting in bodily injury during the policy period. (*Id*. at p. 762.) Safeco undertook the defense under a reservation of rights, but filed a case against its insureds and the decedent's parents seeking a declaration that it had no duty to defend or indemnify its insureds because the policy had an exclusion for "illegal acts," which excluded coverage for "liability for bodily injury 'arising out of any *illegal act* committed by or at the direction of an insured.' " (*Id*. at pp. 761–762.)

The Supreme Court concluded Safeco had a contractual duty to defend or indemnify its insureds, despite the "illegal acts" exclusion. The court first determined it could not interpret the "illegal acts" exclusion narrowly to preclude coverage only for violations of *criminal* laws, since the policy did not

9

expressly state as much.[5] (*Safeco, supra*, 26 Cal.4th at pp. 763–764 ["we cannot read into the policy what Safeco has omitted"].) Then, the court rejected an expansive construction of the exclusion that would have denied coverage for a violation of *any* law, criminal or civil. (*Id.* at p. 764.) The court reasoned this construction would be "so broad as to render the policy's liability coverage practically meaningless." (*Ibid.*) As noted, Safeco's policy promised coverage for bodily injury caused by an "occurrence" or "accident," which encompassed negligence claims. (*Id.* at pp. 764–765.) However, the duty to exercise ordinary care for negligence purposes is imposed by law, so "[a] violation of that duty is ... *a violation of law.* ... An insured's negligent act, being a violation of law and therefore *an illegal act*, would thus not be covered under Safeco's policy excluding coverage for an insured's illegal acts." (*Id.* at p. 764.) According to the court, Safeco's promise of coverage for bodily injury claims caused by negligence "would be rendered illusory if ... [the court] were to construe the phrase 'illegal act,' as contained in the policy's exclusionary clause, to mean violation of any law, whether criminal or civil." (*Id.* at p. 765.) Because the "illegal acts" exclusion could not reasonably be

---

5    The insurance policy at issue in *Safeco* did not include an express *criminal act* exclusion—i.e., a provision excluding an insured's *criminal acts* from coverage. (*Safeco, supra*, 26 Cal.4th at p. 763.) Instead, it contained an *illegal act* exclusion, which excluded an insured's *illegal acts* from coverage. (*Ibid.*) Further, in contrast to the insurance policy at issue in the present case, the *Safeco* policy did not expressly exclude coverage where, as here, an insured pleaded guilty in a criminal proceeding involving the same acts or activities which were the basis of a claim for damages against the insured.

construed either broadly or narrowly, the court invoked Civil Code section 1653,[6] and "rejected" the exclusion as "invalid." (*Id.* at p. 766.)

To determine whether the intentional acts exclusion in Mid-Century's homeowners insurance policy is impermissibly overbroad, thus rendering the promise of coverage in the policy illusory, we apply ordinary principles of contractual interpretation. (See *Yahoo Inc. v. National Union Fire Ins. Co.* (2022) 14 Cal.5th 58, 67.) " ' 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citation.] Thus, "the mutual intention of the parties at the time the contract is formed governs interpretation." [Citation.] If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language "is clear and explicit, it governs." ' " (*Ibid.*) " 'If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " ' " (*Ibid.*)

"In order for a contract to be valid, the parties must exchange promises that represent legal obligations. [Citation.] An agreement is illusory and there is no valid contract when one of the parties assumes no obligation." (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 94–95; *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 804, fn. 4 [" 'By the phrase "illusory promise" is meant words in promissory form that promise nothing. They do not purport to put *any limitation* on the freedom of the alleged promisor.' "], quoting 2 Corbin on Contracts (rev. ed. 1995) § 5.28, p. 142; see also *French Laundry Partners, LP v. Hartford Fire Ins. Co.* (N.D. Cal. 2021) 535 F.Supp.3d 897, 904 [under California law, "[a]n insurance

---

[6] Civil Code section 1653 provides, "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected."

policy provision is only illusory where it results in a '*complete* lack of *any* policy coverage.' "], italics added.) Under the rules of contractual interpretation, "we must interpret the provisions of a contract to avoid rendering the instrument 'illusory.' [Citation.] Contracts of insurance do not enjoy any special exemption from that basic principle." (*John's Grill, Inc. v. The Hartford Financial Services Group, Inc.* (2022) 86 Cal.App.5th 1195, 1219 (*John's Grill*); see *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1507 ["when interpreting a contract, we strive to interpret the parties' agreement to give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable"].)

Applying these rules of contractual interpretation here, we conclude the intentional acts exclusion is not so exceedingly broad that it renders the promise of coverage for negligence claims illusory. At base, the plaintiffs' overbreadth argument rests on the assumption that a negligence claim against an insured *always* is caused by, arises out of, or is the result of an insured's intentional act. Of course, "[i]t is true that an [insured's] intentional *act* may be an element of negligence," *State Farm Fire & Casualty Co. v. Dominguez* (1982) 131 Cal.App.3d 1, 4—but not necessarily so.

Consider the legal duty requirement, which is an essential element of any negligence claim. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).) Civil Code section 1714 provides a " 'general rule,' " governing legal duty. (*Brown,* at p. 213.) The statute "imposes a general duty of care on a defendant only when it is the defendant who has ' "created a risk" ' of harm to the plaintiff, including when ' "the defendant is responsible for making the plaintiff's position worse." ' " (*Id.* at p. 214.) Ordinarily, it does not "impose the same duty on a defendant who did not contribute to the risk that the plaintiff would suffer the harm alleged." (*Ibid.*) "Generally, the 'person who

12

has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." (*Ibid.*)

However, there are "a number of exceptions" to the no-duty-to-protect rule, including the "special relationship" exception: "In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm."[7] (*Brown, supra*, 11 Cal.5th at p. 215.) "Under [these] circumstances, a defendant may have an affirmative duty to protect the plaintiff from harm at the hands of a third party, *even though the risk of harm is not of the defendant's own making*." (*Ibid.*, italics added.) Further, it is black-letter law that a defendant can breach a legal duty, and thus "be negligent[,] by acting or *by failing to act*." (*Raven H. v. Gamette* (2007) 157 Cal.App.4th 1017, 1025, italics added.) Thus, at least in special relationship cases, a bodily injury claim may be based on the breach of an insured's legal duty of care even though the insured did not undertake an affirmative act that made or contributed to the plaintiff's injury. Such claims could fall within the scope of coverage under the policy, unaffected by the intentional acts exclusion.

---

7     "A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' [Citation.] Relationships between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests, are all examples of special relationships that give rise to an affirmative duty to protect. [Citations.] The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury." (*Brown, supra*, 11 Cal.5th at p. 216.)

Moreover, as Mid-Century notes, the intentional acts exemption applies only when bodily injury "is caused by, arises out of or is the result of" an insured's intentional act, a causal limitation on the types of claims to which the exemption applies. The plaintiffs disagree, arguing the exemption's use of the term, "arises out of," makes the exemption so expansive that Mid-Century can invoke it whenever an insured engages in "some type of intentional conduct ... somewhere in the causal chain leading to the [claimant's] harm."[8] In light of the interpretative rule requiring us to read the policy to avoid an illusory promise wherever reasonably possible, we disagree with the plaintiffs' interpretation of the intentional acts exemption.

"California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions." (*Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328.) In this context, " 'the term "arising out of" links a factual situation with the event creating liability and does not import any particular standard of causation or theory of liability into an insurance policy. [Citation.] Rather, " ' " '[a]rising out of' are words of much broader significance than 'caused by.' They are ordinarily understood to mean 'originating from[,]' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with' ....." ' " ' " (*Health Net, Inc. v. RLI Insurance Co.* (2012) 206 Cal.App.4th 232, 262.)

Even so, the policy term, "arising out of," does not simply mean *any* distant or remote causal relationship whatsoever—no matter how feeble that connection might be. At the least, the term "requires more than 'but for'

---

8    Similarly, the plaintiffs argue, "the 'intentional acts' exclusion in Mid-Century's policy will *always* be triggered by *whatever* intentional act either began or *was included in the causal chain* that led to the harm at issue in the insurance claim." (Italics added.)

causation or 'mere presence.' " (*Fireman's Fund Insurance Companies v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842, 849; see *Transcontinental Ins. Co. v. Insurance Co. of the State of Pennsylvania* (2007) 148 Cal.App.4th 1296, 1308 ["Although the phrase ' "arising out of" ' should be broadly read to require only a minimal causal connection, it requires more than ' "but for" ' causation."]; accord *Target Corp. v. Golden State Ins. Co. Ltd.* (2019) 41 Cal.App.5th 13, 19–20 [additional insured endorsement requiring insurance carrier to provide coverage to retailer for claims "arising out of '[supplier's] products' " did not compel carrier to provide coverage to retailer in lawsuit alleging retailer mislabeled supplier's products, even though the existence of the products themselves was seemingly a but-for cause of the mislabeling]; *Kramer v. State Farm Fire & Casualty Co.* (1999) 76 Cal.App.4th 332, 334, 340–341 [landlords' rental dwelling insurance policies requiring carrier to provide coverage for claims "arising 'from the ownership, maintenance, or use of the insured premises' " did not require carrier to defend landlords against claims of sexual molestation that occurred on the insured properties, given that the "required causal connection between the use of those particular premises and the tortious activity causing the injury ... was lacking"].)

All of this is to say that Mid-Century cannot simply invoke the intentional acts exclusion any time an insured—at some point in the long distant past—undertook some intentional act bearing no causal relationship, or virtually no causal relationship, to the negligence claim for which coverage is sought. This feature, as well as the fact that some negligence claims may be predicated on a defendants' *failure* to act or protect, convince us that the intentional acts exclusion does not withdraw all, or "virtually all," coverage for bodily injury claims sounding in negligence. (*Energy Ins. Mutual Limited v. Ace American Ins. Co.* (2017) 14 Cal.App.5th 281, 306; see also *Medill v.*

15

*Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 836 [insuring clause was not illusory, since "not every lawsuit that could conceivably be brought against [the insureds] would necessarily" fall outside the scope of coverage].)

Moreover, irrespective of whether the promise of coverage may seem illusory to the plaintiffs in some theoretical sense, case law instructs that we must interpret insuring agreements with an eye to the reasonable expectations of the insured.[9] (See *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 322; *John's Grill, supra*, 86 Cal.App.5th at p. 1224 ["the test for illusory coverage must focus on objective reality and the insured's reasonable expectations of coverage"].) "The proper inquiry is: Would reasonable insureds expect their homeowners policy to protect them against liability for accidental injury or death occurring in their home?" (*Safeco, supra*, 26 Cal.4th at p. 766.) In *Safeco*, the answer to that question was "yes," under the facts of the case and the language of the insuring document. (*Ibid.*) Here, by contrast, the answer to that question is "no."

Indeed, the facts of the present case are strikingly similar to those presented in *20th Century Ins. Co. v. Stewart* (1998) 63 Cal.App.4th 1333 (*Stewart*). In that case, 19-year-old Matthew Guglietti and his friends held a party at Guglietti's home. (*Id.* at p. 1335.) During the party, Guglietti drank

---

9   This "reasonable expectations" standard resembles the standard that is used by courts in other states, some of which will enforce or modify an insurance agreement according to the reasonable expectations of the insured *even if the promise of coverage in the agreement is illusory.* (See, e.g., *Westfield Ins. Co. v. William B. Burford Printing Co., Inc.* (S.D. Ind. 2020) 467 F.Supp.3d 632, 643 [under Indiana law, "[a]n illusory coverage analysis requires two steps. First, it must be established that the policy is, in fact, illusory. Second, if it is illusory, the [c]ourt must determine if the insured had a reasonable expectation that the policy would provide the requested coverage."]; *Marks v. Houston Cas. Co.* (Wis. 2016) 369 Wis.2d 547, 583 [" 'Where a policy's purported coverage is illusory, the policy may be reformed to meet an insured's reasonable expectations of coverage.' "].)

alcohol, retrieved a .38-caliber revolver from his parent's bedroom, loaded a bullet into the chamber, and pulled the trigger twice—once at a friend and once at his own head. (*Ibid.*) The revolver did not fire with either trigger pull. (*Ibid.*) As the party continued, Guglietti drank more alcohol and smoked marijuana, pointed the revolver at another friend, Govinda Sean DiGeronimo, and pulled the trigger—this time causing the revolver to discharge and kill DiGeronimo. (*Ibid.*) Guglietti pleaded guilty to manslaughter in connection with the incident. (*Id.* at pp. 1335–1336.)

In a subsequent wrongful death lawsuit filed by DiGeronimo's mother, Guglietti tendered his defense to the insurance carrier that issued his parents their homeowner's insurance policy. (*Stewart, supra*, 63 Cal.App.4th at p. 1336.) The carrier assumed the defense under a reservation of rights and settled with DiGeronimo's mother, with the settlement amount contingent on a judicial determination of whether her claim was covered by the carrier's policy. (*Ibid.*) That policy contained an exclusion that applied to " '[b]odily injury or property damage which [was] a foreseeable result of an intentional or criminal act of any insured or which [was] in fact intended by any insured.' " (*Ibid.*) The trial court found no coverage due to the exclusion, and the *Stewart* court affirmed the judgment on the same grounds. (*Ibid.*)

The *Stewart* court determined that the exclusion applied and was unambiguous under the facts of the case—but even if the exclusion was ambiguous, the insured had no reasonable expectation of coverage. (*Stewart, supra*, 63 Cal.App.4th at p. 1338.) In so holding, the court rejected a claim that Guglietti's act of manslaughter was "based on and really nothing more than negligence and ... an insured would reasonably expect the [p]olicy would cover injury caused by an insured's negligence." (*Id.* at pp. 1338–1339.) As the court explained, this characterization "trivialize[d] [Guglietti's] conduct.

17

This [was] not a case in which a revolver was negligently mishandled and fired by mistake or inadvertence. Guglietti deliberately and intentionally pointed the revolver at DiGeronimo and deliberately and intentionally pulled the trigger. ... Presumably his purpose was not to injure DiGeronimo; nevertheless, he killed him after having placed one bullet in the revolver and firing twice without the bullet reaching the chamber. His conduct was with such disregard for human life that it could be considered to have been committed with implied malice and therefore have constituted second degree murder. [¶] Under these circumstances ... the insured could not reasonably have expected the [p]olicy's coverage for injury caused by negligence to have covered Guglietti's criminal act." (*Id.* at p. 1339.)

Under the facts of the present case, we similarly conclude that the insured would have no reasonable expectation of coverage under the homeowner's insurance policy at issue. Specifically, we conclude that the insured would not reasonably expect Alonzo's conduct—his act of consuming alcohol, intentionally aiming a firearm at another person, and intentionally pulling the trigger on that firearm, followed by his guilty plea to a criminal offense—would both fall *within* the scope of coverage for an "accident," and *outside* the exclusion barring coverage where, as here, an insured "plea[ds] [] guilty ... in a criminal proceeding[] ... involv[ing] the same acts or activities which are the basis of [the] claim for damages against [the] insured ...."

Because the promise of coverage in Mid-Century's homeowners insurance policy is not illusory, and the insured would not reasonably expect coverage under Mid-Century's policy, the trial court properly sustained the defendants' demurrers to the plaintiffs' breach of contract cause of action.

18

C. *Plaintiffs Failed to State A Bad Faith Cause of Action*

Plaintiffs also challenge the trial court's implied determination that they failed to plead facts sufficient to state a cause of action for breach of the implied covenant of good faith and fair dealing—i.e., for bad faith.

"[I]f there is no potential for coverage and, hence, no duty to defend under the terms of [an insurance] policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 (*Waller*), italics omitted; *1231 Euclid Homeowners Association v. State Farm Fire & Casualty Co.* (2006) 135 Cal.App.4th 1008, 1021 (*Euclid*) ["Since [insurer] was not in breach of contract and owed no policy benefits to [insured], its failure to pay such benefits cannot serve as a basis for a claim for bad faith."].)

Here, the defendants owed no duty to defend or indemnify Alonzo in the wrongful death action because the intentional acts exclusion was triggered according to its terms and, as discussed above, the scope of the exclusion did not make the promise of coverage illusory. Because the defendants had no duty to extend coverage to Alonzo, the trial court properly sustained the demurrers to the plaintiffs' bad faith cause of action. (*Waller, supra*, 11 Cal.4th at p. 36; *Euclid, supra*, 135 Cal.App.4th at p. 1021.)

19

## IV

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

McCONNELL, P. J.

I CONCUR:

CASTILLO, J.

Dato, J., Concurring.

I have serious concern that the "intentional acts" exclusion in this Mid-Century homeowners insurance policy—including but not limited to injury or damage arising from "any intentional act or intentional failure to act by any insured"—is written so broadly that it could be invoked to refuse coverage for the garden variety negligence claims that every insured homeowner seeks to protect against. As the majority opinion recognizes, however, even where a policy is deemed illusory in some abstract or theoretical sense, insureds must still demonstrate that coverage for the claimed injury or damage would be consistent with their reasonable expectations. (Maj. opn., *ante*, at p. 16; see *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 767.) Here, the specific example referenced in the intentional acts exclusion—the insured's plea of guilty in a criminal proceeding—conclusively negated any reasonable belief that this policy provided coverage for this injury. On that basis, I concur in the affirmance of the judgment.

DATO, J.